We have four arguments on for oral argument this morning. The first case is FLEXITEEK AMERICAS v. PLASTEAK INC, number 2009-15-01. Mr. Wilson. May it please the court. My name is Bruce Wilson. I represent the Plastique defendants in this appeal. A matter of procedure, I think, ought to, although my time is short, be brought to the court's attention. After the case was briefed and the appendix, which is considerably larger than I wish, was appeared and filed with the court, the trial court entered an order, which I sent to this court just a few weeks ago. At Mrs. Hendricks' suggestion, I had asked that it be designated because it has considerable relevance, I think, for the valuable time that we're spending here today to process the issues on appeal. I have reference to docket 231, which is the trial court entry, that, this was one of the good things that happened to me, indicates that the trial court has terminated permanent injunction. That was the subject, was to be the subject, may still be the subject of a second appeal, in this case 2010-12-56. That appeal has been briefed, although counsel are still arguing about the adequacy of the appendix. I ask the court's clerk to delay the filing of the appendix while we consider the mootness, if you will, of the second appeal, which was addressed to the permanent injunction, that has now been terminated. The order that the judge signed, however, is, while it's good news, it may also predict more of a future to this case than I hope pans out. You may know from the briefing that the 881 patent is also the subject of re-examination proceeding. That proceeding is now at the Board of Patent Appeals and Interferences. The Patent Office has filed their submissions. They are waiting for a conforming brief from the patent owner. What Mr. Long apparently told the trial court is he expects some success in that process at some stage. There are 20 or more new claims which are, have spawned from the presently rejected single claim of the 881 patent. So I may indeed have full employment in this case if the re-examination, in fact, yields a new set of narrower claims. To my regret, and this is my first point pertaining to today's argument, they will still have the defining element, which was the bane of my existence in the trial court, that is the presence or absence of longitudinal slots in any way. What are they? So does all of the discussion we've had so far, just so I'll be clear, that doesn't in fact or affect what we have to do today with respect to the issues on appeal? It is one of the areas I've assigned and I persist in my argument that I would like a new claims construction. I think the fall claims construction trial court was grossly overbroad, so much so that it brought into play all of the prior art in the prosecution history as well as the soon to become noted New Zealand proceedings that revoked the mirror image of the U.S. patent. It is so broad that if it will read on all of the prior art, which has to do with the extrusion of PVC products that are made to look like wood, then there's little chance that if this trial court sticks with its claim definition, I will ever escape the scope of the single claim of the 881 patent as long as something that comes from it still has longitudinal slots as the court has defined them without any limitation on their size or shape. To dwell one second further... But you say you will never escape. I don't understand. I mean, you've been tagged with damages for past infringement. Yes. Are you suggesting that we can't design around it? I mean, I don't quite understand why... I think you can. I would encourage as much relief as I can get from this court. So when you say you will never escape, we're talking about injury versus... Well, my assumption is that if my second argument, which is the unenforceability argument, is not convincing, and the case returns to the trial court because there is a reexamination of the 881 patent that yields something for the benefit of the current patent owner, the trial court fully expects Mr. Long to come back and say, well, reimpose the injunction, punish the appellant for being so uppity as to continue to violate the injunction, give me my damages, and for that matter, give me some more. So I am asking that the court seriously consider, and it's an open review, whether or not the trial court's claim construction can stand scrutiny. I think it is erroneous. I've given you my reasons why. It turns out that if you accept the trial court's claim construction in the history of the prior art, you will see that the inherent result of pushing... Well, let me ask you about that. I think I understand the arguments you're making with respect to why the district court's claim construction was wrong. It wasn't clear to me what you were proposing as an alternative claim construction. That the slots, the longitudinal slots, which is the precise word used in the claim, would not be insubstantial. The inherency in pushing PBC through a die, as demonstrated in the prior art, is that you will not have a perfectly smooth piece no matter whether the die was designed for that effect or not. You will only get the longitudinal slots intended by the patentee if you deliberately form them so as to relieve structure, allow the material to bend laterally, and provide a base for glue. So I cannot escape the inherency, but I should not also be strung up by the inherency which is clear and present in the prior art. May I go now to my unenforcement argument? I recognize as I sit down that I will have not fully expurgated on this subject, but I do know that the court has addressed, and is again going to address, what the intent to deceive exercise is all about. So I've done my best to bring my argument forward in this way. When it came time, having been prohibited from talking about the invalidating U.S. patent at Kemmerer, which had cropped up in the New Zealand proceedings, which was withheld from the U.S. Patent Office, having been prevented from arguing about the significance of the revocation proceedings in New Zealand until the jury trial was over, finally the court recognized that that was pretextual, that that material ought to have been given, ought to have been used at an earlier point in the case. Well, it seems to me the problem we have with inequitable conduct is that the district court didn't grant a summary judgment here. The district court had a bench trial, and they made a credibility determination, so they found that the other side's assertions for why they did what they did, why they didn't do what they didn't do, was in good faith, and he found those assertions to be credible. And it's not clear to me how you can overcome those credibility determinations. Well, because on a careful reading, Your Honor, of the examination I made of Mr. Abrahamson, the declaration he gave was false and misleading. And that's the extra. That's the extra indication of an intent to deceive that's talked about in Paragon, through Praxair, in the Opium case, the Starr Scientific case. There's something more here than a CEO who comes in unsupported by any of the patent counsel, whether they're in Norway, Sweden, or the United States, in his recollections about things that he did not personally experience. His trial counsel, two months or so... But on that question, the district court kind of just construed the omissions to bring others in against you, not in your favor. In other words, the burden is on you to establish the inequitable conduct, and the district court refers to the fact that in his findings, or her findings, that you didn't depose or attempt to procure the testimony of any of these people. Why shouldn't that be construed against you? I mean, you're trying to use what they might have said here... In other circumstances... Excuse me. In other circumstances, that might have been a just criticism of me, but the witness himself says, on inquiry, and who would answer to him more than his patent counsel, there were no written records of any concurrent deliberations about what should be done with the IPONs, you'll pardon the acronym, proceedings, or the Kemmerer reference. He couldn't support it. What would I be expected to find if I went looking for it? He couldn't remember the lawyers' names, who presumably put together the advice which he told the trial court, personally, in paragraphs 19, 20, and 21 of his declaration, that he took and relied on. He did no such thing. That was false and misleading, and he finally tells me that. That that declaration, as extensive as it was, which paved the way for me finally to be able to get Kemmerer and the IPONs proceedings before the court, was made up, for the occasion, by his trial counsel. So, I think that is a further indication, if you'll permit me saying so, from your jurisprudence, that there's more here than the deliberate withholding of a highly material reference, which the court finally gives me, at the trial level, from the patent office, where it would have done the most good, and is today, frankly, doing the most good in terms of the reexamination. So, I'm trying to, if you will, take advantage of this further definition of what it takes to prove an intention. I realize my burden is high, but I insist that, on a careful reading, you will find the Abrahamson declaration is, in itself, is false and misleading. And it should be a further indication that the ultimate sanction of holding the single claim of this patent unenforceable is more than justified. I think I'd better save your time. Very well. Thank you, Your Honor. We will save your remaining time. Mr. Long. May it please the Court. My name is Tracy Long, formerly of the firm of St. Tucci Priory & Long. Now I'm the sole owner of my own firm, a law office, the Best Tracy Long, and I have the pleasure of representing the plaintiffs down below, Flex-A-Teek International A.S. and Flex-A-Teek Americas. Now, Your Honor, you'll probably be able to tell from my recent filings that I believe that this case could be resolved on briefs alone, and I still maintain that. However, when asked whether I wanted to waive my oral argument, I didn't think that it would be prudent to do so, so I came down here so I could hear what Mr. Wilson had to say and respond in time if the situation warranted it. I've not heard anything on his oral argument, which I have not previously addressed in my response brief. Therefore, I will rely on that. What I would like to say is the two problems that I've received with this appeal is, much like the case down below, it was very scattershot. The appellant here has appealed no less than eight orders, not counting the merged rulings from the lower court. The record is also problematic here. I would have conceivably loved to have had the entire record before the court, but the court does not welcome the entire record, only the relevant portions. Had the court had a chance to review the entire record, they would see that many, if not all, of the court's rulings down below were the result of the defendant's inability to follow the rules, come forward with evidence, and just obey the rules of the road. I think what happened down below was the result of a litigator, myself, who's not a patent attorney, versus a patent attorney who is not necessarily a litigator. Let me ask you about the inequitable conduct. I don't think we have the entire site here, but in gray, for example, they cite to Mr. Abramson's declaration, and in that declaration, at least one of the reasons that he gave for not disclosing what was going on in New Zealand were the plaintiffs were specifically told that because the claims of the 881 were allowed and the issuance fee was already paid, there could be no further disclosure considered by the USPTO. So that was at least one of the reasons that Mr. Abramson gave for non-disclosure to the Patent Office. That can't be right, can it? I mean, so he's saying, it's highly material, and I didn't give it to the Patent Office because I was told, presumably by my lawyers, that since the claims were allowed, the issuance fee was already paid, there couldn't be no further disclosure to the PTO. If that's his reason for not disclosing, isn't that problematic for your side? Well, I think it goes to his, at least arguably to his good faith argument, why it wasn't disclosed. Well, let's assume, I mean, is that correct? I mean, as far as you know, I know you said you're not a patent lawyer. Is that correct? So if there's a highly material probative thing that's going on in New Zealand, he says he didn't give it to them because he had two weeks left and time had run out on him. Is that the way the Patent Office works? That can't be right, right? As you noted, I'm not a patent attorney. However, the patent attorney who was with me on the case... So you think he was precluded from introducing anything going on? That was my understanding, that once the patent is issued and the fee paid, the USPTO doesn't want any further submissions to it. Well, what was the timing? The fee had been paid, but the patent had not been issued. Is that correct? That's a chronology that the... At the time of Mr. Abraham's representation about his decision not to disclose the iPod. Well, I think that's one of his reasons for... Let's just get to the timing. In response to Judge Prost, you just said after the patent issues, they don't want to hear it. But I thought that was not the timing at issue. I think the exact chronology is that the patent was approved in December. Right. Approved, but not issued yet. They sent the fee notification and the notice of allowance to FTSEC International, AS's Patent Council. The fee was paid in January. Right. Then the patent was issued, I believe, in May. All right. So the events that we're concerned with occurred prior to issuance, I take it? Formal issuance and publication, yeah, of the patent. But the point, in fact, the claims have been allowed and the fee paid. And my understanding from Patent Council, who was with me during the trial, that if you send in anything to the USPTO, at that point, they'll just send it back to you. How can that be right? I mean, let's assume there's, you find invalidating prior art. I mean, you're saying that you don't have, not only do you not have an obligation to disclose it to the Patent Office before the patent issues, but you're precluded from disclosing it to the Patent Office before the patent issues? With all due respect, Your Honor, I think you have to consider the exact circumstances that Mr. Abramson is getting this. First of all... But just to answer my question, if you find invalidating prior art during this interim period, you're suggesting that, not only does he not have an obligation to disclose it, but that the Patent Office wouldn't let him, wouldn't look at it anyway? It's like the Patent Office is going to say, no, too late. You're going to get your patent no matter what you tell us because you've already gone through these other earlier steps? I have to honestly respond, Your Honor, that I don't know. And I look for... Well, doesn't that sound a little odd to you, that the Patent Office would refuse to accept information for the patentee that would invalidate... I think if the patentee is moving for a re-examination himself or a continuation, yes, you would submit the new prior art that you had located. However, during this interim period, look, I look for authority and Patent Counsel look for authority on exactly this point, and we could not find anything. Well, you're the ones that said that they were told, presumably by counsel, that because the patent was allowed, there could be no further disclosure to the Patent Office. You're the one making this assertion, so presumably you know the ins and outs of why legally you were precluded from... I wasn't Patent Counsel at the time. Well, that's not going to carry the date. I know, but there was a separate Patent Counselor who preceded me. I wasn't aware what they advised them. All I know is what Mr. Abramson told me. And if you consider the circumstances, he's being told this. They abandoned the New Zealand patent, and from his perspective, the New Zealand patent has a different structure than the U.S. patent in that the New Zealand patent had, I believe, 16, 17 different claims, and the longitudinal slots, which are at issue, really the primary issue in this case, were in a dependent claim, not an independent claim, whereas in the U.S. it was... everything was smushed down into one claim at the suggestion of the examiner. So, you know, getting that information, the abandonment of the New Zealand patent, the different structure, and the timing of the payment and allowance, he's being told by Patent Counsel, look, you don't need to disclose that, and that's what he testified to in his declaration, and that's the time of trial. So back to what I was talking about earlier. I believe that the district court's rulings should be affirmed per curiam because the appellants here have not identified anything that the court did wrong down below. They followed every step of the procedure. They gave the appellant every possible chance to come forward and make their arguments properly. It is ignored to do so. You would say, Mr. Malone, that even assuming... I guess your position would have to be assuming for the moment that the legal advice with respect to what could be submitted to the patent office was incorrect at the time it was given, the fact remains that Mr. Abramson acted in good faith without improper intent. Right, exactly, and that was what the district court found. They found that the material was material and would have been material to the examiner. What he found, based upon Mr. Abramson testifying in front of him, that he had credibility... Let me ask you, I think when Mr. Wilson was at the podium, he was asked the question, well, why didn't you... it was suggested that he could have come forward with evidence to challenge the veracity of Mr. Abramson's declaration or statements about his intent, and I think Mr. Wilson responded that nobody knew who the lawyer was or where the lawyer was. Do you have any response to that? Have I got to correct what he said? You got to correct what he said, but his statement is absolutely wrong. He had the prosecution history, which has all the submissions from the Patent Council, both for the PCT during the IPONS decision or revocation proceeding, and the United States. He had not one Patent Council. He had three sets of prior counsel, which would appear in that prosecution history. The statement that we're concerned with, was this made by Swedish Patent Council, the statement that you can't submit this, or who... which of the three counsel, I guess I would say, made the statement that sort of was the focus of the discussion? It would have been their local Swedish counsel that served as, I guess, master counsel and pushed out to various jurisdictions where the nationalization of the PCT application was going forward, and everything went back to them, and they advised Mr. Abramson. Do you... Please, go ahead. Do you... Turning to the claim construction issue... Yeah. Do you think that... Well, two-part question. First, do you think that trial judges' construction would reach longitudinal slots, which were minuscule, as in at the molecular level of size? Well, let me hear your response to that, and then we'll move... No, there's... I understand what you're saying. Okay, go ahead. I understand what you're saying, okay? I just fundamentally disagree with Mr. Wilson that the slots that were identified on the PLAS deck... Well, you're getting ahead of me. I want first an answer to whether you think that claim construction would apply to slots, no matter what their size, including slots of molecular size. I do. There was nothing in the specifications which would limit the size or shape of those longitudinal slots. And if you read the specifications of the 881 patent, you see the elegance of those longitudinal slots and what they actually did. The inventor was faced with an unusual problem. If you make the panel too rigid, and this is actually mentioned in the specifications, you can't secure it without nails or staples or something, and you lose integrity as you bend it. You make it too soft, and then it's a puddle of dew, and it won't hold the shape, and it wears a lot faster. So you have a complex physical chemistry problem which they resolved through longitudinal slots. And by putting longitudinal slots in there, it enhances the ability of something to bend to the point where it doesn't require nails and can be secured with glue, yet rigid enough to retain their shape. That's the beauty of the longitudinal slots. Of course, if there were slots of molecular size, the bending would not be materially different. The capacity to bend would not be materially different from a surface that had no discernible slots, right? No discernible slots. It just completely... I want to make sure we're on the same wavelength. So listen closely to the question. If the slots are so small as to be literally a nanometer, let's say, in size, that piece of the device would not be any more bendable, any materially any more bendable than one that had no slots, correct? Incorrect. It would still be more bendable, because... But not materially. Materially it would be, because say you're using injection molding, where you're just pushing plastic into it. All the molecules are random. There's no longitudinal structure whatsoever. And when you bend it, even through the application of heat, it's going to buckle, okay? And it's going to lose its integrity, and it's going to wear faster. Well, it sounds like when you say that the molecule... You're talking about the molecules lining up. That sounds like some kind of reference to the crystalline structure as opposed to simply the slots, which are a physical indentation, as I understand it, in the bottom of this device. No, actually, according to Dr. Rhee, and this appeared in his supplemental declaration, is... And specifically, you can see it with the plastic materials once it's magnified. Those slots are equal distance, parallel, and planned. They are an intentional act rather than something random being pushed through an extruder. So, I see my time is up. So, I thank the court for its attention. Any questions? Thank you. We'll hear rebuttal. Thank you, Your Honor. I did my best to persuade Judge Kahn to consider prosecution disclaimer in construing the single claim of the 8181 patent. I made the cardinal error, which I now confess. I'm talking about prosecution estoppel. I was thinking ahead to the infringement stage, but my explanation, as you think would find in the record if you were grading my performance, was a sincere attempt to draw his attention to the fact that none of us could outrun, if you will, the prior history in the art of extruding PVC. Enough about that. Now to Mr. Abrahamson. What his counsel put together for his declaration, I am asserting, was itself a fraud on the court because it was delivered verbatim, as you see it, two months prior to this trial. I didn't get a chance to question him about it until after the jury trial. So the judge's mind was, if you will, burdened with a false and misleading declaration. Look at some of the other material in it. He gave every excuse one could think of under the circumstances. Well, you had the opportunity to make all of these arguments to the district court judge. I did. The district court judge, at the end of the day, made a credibility determination and he believed Mr. Abrahamson. So doesn't our standard of review kind of limit the extent to which we're going to be able to take your argument here? With respect, Your Honor, I don't think so because Mr. Abrahamson admitted that anything he might have thought about with regard to defending the conduct was the result of being tutored to sign the declaration he signed. None of that discussion about the change in the design of the product about not responding in New Zealand. They filed a counter-statement in New Zealand. They tried to tell the court in Florida they thought it was so worthless and the judge actually bought that argument that it was so worthless for them to proceed in a market that they didn't really want to exploit that they gave up on the revocation proceedings. They did no such thing. The record shows that they opposed the revocation and they addressed the precise art which is at the center of the dispute today in the re-examination and perforce in my arguments that, if you will, there was fraud in the patent office but there was also fraud in the court and obviously I had in mind, as I said before, the Praxair case and some others that say it isn't enough for me to rest on the falsity of the declaration and the materiality of the art. I've got to go a little further. Well, I think I've gone considerably further in my remarks and I simply wish to draw to your attention that Mr. Abrahamson was the perfect fall guy to make the excuses that nobody was going to support, not the Virginia lawyer, not the Swedish lawyer, whoever they are, and there was no written record that could be fetched up even when the declaration was being prepared to support it. Not the usual circumstance. With regard to the late disclosure, in my experience, I think in most practitioners' experience, if you have a reference that's found late in the prosecution, what is the better part of observance of the duty of candor? To give it or to withhold it? To give it. Well, that may be best practice, but the question that we've been struggling with here is is there a rule as to whether, A, you have an obligation, a continuing obligation until issuance to present that material to the patent office, or, B, if the patent office won't look at it even if you do present it to them, do you have any learning on that? Neither party seems to have come up with anything here. Well, shame on me. Well, maybe you have. I believe, Your Honor, the duty of candor is there and continues throughout the life of the patent. Well, but do you have anything to point us to other than your testimony here today?  but I would waste my time in trying to fetch it, Your Honor. Did you respond? Did you make that argument to the district court at all, either through a witness or through your own argument? Frankly, the limited opportunity I had... Is the answer no? The answer is no. I'm sorry. The answer is no. Very well. If you have anything further... Thank you. Thank you for listening. The case is submitted. We'll hear argument next in number 2010-3074, Jones, against the MSPB. Mr. Mitchell, you may begin when you're ready. May it please the Court. My name is Gregory Mitchell. I'm here on behalf of Mr. Brian C. Jones.     in the public eye for a long time. because essentially what we have here is that at the final agency decision, there was no instructions given by the agency directive on what course Mr. Jones could take. As pointed out in my appendix, document number 74, the assistant director of the FBI essentially advised Mr. Jones in that letter that the only appeal you have following the agency's final decision is to the district court. And therefore, that's where you have to proceed. In trying to advise Mr. Jones essentially what course he had, it was prudent on me to essentially take a look at what the case logo was.